UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| LAUREL LIBBY, ALEXANDER TITCOMB, PAULA SUTTON, THE DINNER TABLE PAC, FIGHT FOR FREEDOM PAC, and MACHIAS CHRISTIAN FELLOWSHIP,<br><br>*Plaintiffs.*<br><br>v.<br><br>WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS III, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; SARAH E. LECLAIRE, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; STACEY D. NEUMANN, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; and AARON M. FREY, in his official capacity as Attorney General of Maine,<br><br>*Defendants.* | Civil Action No. 23-cv- |

**COMPLAINT**

#16066011v2

## INTRODUCTION

Before 2023, all state legislators had equal ability to control political action committees (PACs). All legislator-led PACs had no fundraising limits. But now, in Orwellian style, some legislators have become "more equal" than other legislators. Now, only four legislators can raise unlimited dollars. Which four? The most powerful, of course—the Speaker of the House, the President of the Senate, and the minority leaders of each house designate a "caucus PAC" that maintain unlimited fundraising ability. The remaining 182-members of the legislature have become less-equal. Their "leadership PACs" are extremely limited in the funds they can raise, with limits being like that of an individual candidate. It is important to note that each of these 'caucus PACs' is under the direct control of a single legislator—except for the ability to raise unlimited funds, they are no different from other leadership PACs subject to limits.

Maine's contribution limit on leadership PACs violates the First Amendment freedoms of speech and association. Maine's interest in combatting corruption cannot justify such a limit. In fact, corruption is better fought by eliminating this limit—particularly when party leaders are not equally constrained. Accordingly, 21-A MRSA 1056-C, should be declared unconstitutional and enjoined, both preliminarily and permanently.

## JURISDICTION AND VENUE

1. This Court has jurisdiction under 28 U.S.C. § 1331 over this action arising out of the First and Fourteenth Amendments to the United States Constitution; and

under 42 U.S.C. § 1983, because it involves a deprivation of rights secured by the Constitution.

2. Venue lies in this Court because all defendants reside in this judicial district, and the events giving rise to these claims occurred and are occurring here.

THE PARTIES

3. Plaintiff Laurel Libby is a member of the Maine House of Representatives from the 90th Legislative District. She is the co-founder of The Dinner Table PAC and is also the principal officer of the Fight for Freedom PAC.

4. Plaintiff The Dinner Table PAC is a political action committee formed under the laws of the State of Maine and in 2023 became subject to the challenged fundraising limits. The Dinner Table PAC seeks to provide a voice for Mainers who believe in advancing limited government, free enterprise, personal responsibility, and individual liberty, by which they can support the election of like-minded candidates.

5. Plaintiff The Fight for Freedom PAC is a political action committee formed under the laws of the State of Maine and in 2023 became subject to the challenged fundraising limits. The Fight for Freedom PAC supports candidates and causes that advance freedom in Maine.

6. Plaintiff Alexander Titcomb is the co-founder, principal officer, and Executive Director of The Dinner Table PAC. He also serves as the treasurer of the Fight for Freedom PAC.

7. Representative Libby and Titcomb are also the primary fundraisers for The Dinner Table PAC. Representative Libby is also the decision-maker for The Dinner Table PAC.

8. Plaintiff Paula Sutton is a former member of the Maine House of Representatives who represented the 95th Legislative District from 2016 to 2018. She is still active in Maine politics, including as a donor. As a donor, Plaintiff Sutton desires to make contributions to Plaintiff The Dinner Table PAC that would exceed the limits for donations to a leadership PAC.

9. Plaintiff Machias Christian Fellowship is a non-denominational Christian worship community located in Machias, ME, organized as a non-profit corporation. The Fellowship has not sought tax-exempt status under the federal Internal Revenue Code. As a donor, Plaintiff Machias Christian Fellowship desires to make contributions to Plaintiff The Dinner Table PAC that would exceed the limits for donations to a leadership PAC.

10. Defendant William J. Schneider is sued in his official capacity as the Chairman of the Maine Commission on Governmental Ethics and Election Practices, an independent state agency that administers Maine's campaign finance laws, the Maine Clean Election Act, and the state's lobbying disclosure law. The Commission also issues advisory opinions and conducts investigations regarding legislative ethics.

11. Defendant David R. Hastings is sued in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices.

12. Defendant Sarah E. LeClaire is sued in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices.

13. Defendant Dennis Marble is sued in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices.

14. Defendant Stacey D. Neumann is sued in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices.

15. Defendant Aaron M. Frey is sued in his official capacity as Attorney General of Maine.

16. All defendants are named in their official capacities only.

STATEMENT OF FACTS

*The regulatory scheme*

17. Maine law defines a PAC as "[a]ny separate or segregated fund established by any corporation, membership organization, cooperative or labor or other organization," or "[a]ny person, including any corporation or association, other than an individual, that receives contributions or makes expenditures aggregating more than $2,500 in a calendar year for the purpose of influencing the nomination or election of any candidate to political office . . ." *See* 21-A M.R.S. § 1052(5)(A)(1) and (5).

18. As of January 1, 2023, Maine classifies PACs into four categories: traditional, leadership, caucus, or separate and segregated fund.

19. A "caucus PAC" is a single political action committee created to "promote the election of nominees of the caucus leader's political party to the body of the

Legislature of which the caucus leader is a member." 21-A MRSA § 1053-C(2). Only one caucus PAC may exist per caucus, and it must be identified in writing to the Commission. *Id.* As each of Maine's two legislative houses has two political party caucuses, Section 1053-C(2) contemplates a maximum of four caucus PACs, controlled by the four respective party leaders.

20. A "leadership PAC" is defined as "political action committee, *other than a caucus political action committee* under section 1053-C, that was directly or indirectly established by a current member of the Legislature or that is directly or indirectly maintained or controlled by a current member of the Legislature." 21-A MRSA § 1052(4)(C) (emphasis added).

21. A "traditional PAC" is defined as an "organization or group, including a corporation or membership organization, other than an individual, that raises and/or spends funds for the purpose of influencing the nomination or election of a candidate to political office." 21-A MRSA § 1052(5)(A)(5).

22. All PACs donations to legislative candidates are subject to the contribution limits imposed on individual donors. 21-A MRSA § 1015(2)(A).

23. Leadership PACs are subject to contribution limits that do not apply to caucus or traditional PACs.

24. First, "[a]n individual may not make contributions to a leadership political action committee aggregating more in a calendar year than the amount that the individual may contribute to a legislative candidate in any election under section 1015, subsection 1.". 21-A MRSA § 1056-C(1). Committees may not

contribute to leadership PACs more in a calendar year than they may contribute to a legislative candidate in any election, and they may not contribute any funds to leadership PACs derived from business entities. *Id.* § 1056-C(2). Those annual contribution limits currently stand at $475 (the individual contribution limit to any legislative candidate for primary and general elections). *See* Maine Commission on Governmental Ethics and Election Practices, https://www.maine.gov/ethics/political-activity/contributing-information (last visited May 17, 2023).

25. Second, leadership PACs may not receive contributions from a "business entity." 21-A MRSA § 1056-C(3). "'[B]usiness entity' includes a firm, partnership, corporation, incorporated association, labor organization or other organization, whether organized as a for-profit or a nonprofit entity." 21-A MRSA § 1056-C(4).

26. A person or political action committee who knowingly makes or accepts an unlawful contribution commits a Class E crime. 21-A MRSA § 1004(1). Such violations are punishable by up to six months' imprisonment, 17-A MRSA § 1604(1)(E), and by fines of up to $1,000 for individuals, *id.* § 1704(5), and $10,000 for organizations, *id.* § 1705(5).

27. Additionally, "[a] person that accepts or makes a contribution that exceeds the limitations . . . may be assessed a penalty of no more than the amount by which the contribution exceeded the limitation." 21-A MRSA § 1004-A(2).

28. The Commission has the power to "collect the full amount of any penalty . . ." 21-A MRSA §1004-B. "[F]ailure to pay the full amount of any penalty assessed

#16066011v2

by the commission . . . is a civil violation by the candidate, treasurer, party committee, political action committee, or other person." *Id.*

29. The penalized party generally has 30 days to pay the full amount of the penalty. *Id.*

30. If the penalized party fails to pay the penalty within 30 days, the Commission "shall report to the Attorney General the name of any person who has failed to pay the full amount of any penalty . . ." *Id.*

31. The Attorney General "shall enforce the violation in a civil action to collect the full outstanding amount of the penalty. . ." *Id.*

*Continuing impact of Maine's Leadership PAC restrictions on Plaintiffs' speech and association rights*

32. Because Libby founded The Dinner Table PAC and Fight for Freedom PAC, helps maintain these PACs, and exerts control over them, The Dinner Table PAC and Fight for Freedom PAC are considered leadership PACs.

33. Maine's leadership PAC restrictions have severely impacted The Dinner Table PAC and The Fight for Freedom PAC's ability to raise money, and consequently, Plaintiffs' ability to associate and express themselves for political purposes.

34. The Dinner Table PAC raised over $489,880 during the 2022 election cycle, the last election cycle before the leadership PAC restrictions went into effect—a historic amount for a political action committee in Maine.

35. During the calendar year 2021, 53 individuals gave at the $475 maximum limit or higher. In 2022, 69 individuals gave at the $475 maximum limit or higher.

36. In 2021, 4 business entities gave a total of $3,500 and in 2022, 12 business entities gave a total of $10,000.

37. Because of the leadership PAC restrictions, The Dinner Table PAC would not be able to cash these checks or solicit these contributions.

38. Some of these donations were substantial. The top 5 individual donors to The Dinner Table PAC each contributed more than $10,000.00, while the Make Liberty Win PAC and the Maine Republican Party contributed $45,000 and $25,000, respectively, to The Dinner Table PAC.

39. Because The Fight for Freedom PAC was only created in December 2022, it has already curbed its contributions to the $475 maximum limit from individuals and has not received any contributions from business entities.

40. Libby and Titcomb have identified donors who would contribute to The Dinner Table PAC and Fight for Freedom PAC in amounts exceeding current contribution limits were it lawful to do so. But they have turned down contributions that would have exceeded the leadership PAC limits. They stand ready to solicit and accept such contributions but refrain from doing so only because they fear fines, penalties, and imprisonment if they violate the leadership PAC limits.

41. Due to the leadership PAC limits, Plaintiffs Libby and Titcomb have also changed the way they solicit contributions by limiting their engagement with specific donors and limiting the fundraisers The Dinner Table PAC holds. For example, Plaintiffs intend to create a separate level of membership for high-dollar

donors to The Dinner Table PAC but refrain from doing so owing to the leadership PAC contribution limits.

42. Plaintiff Paula Sutton, who donated $5,200 to The Dinner Table PAC in 2022, wants to give The Dinner Table PAC $5,200 for the 2024 cycle, but refrains from doing so fearing fines, penalties, and imprisonment should she violate the leadership PAC restrictions that limit individual leadership PAC contributions to $475.

43. Plaintiff Machias Christian Fellowship contributed $1,000.00 to The Dinner Table PAC in 2022, Machias' senior pastor, Aaron Dudley, promised that the church would contribute more in future election cycles. But although Machias stands ready to donate more money to The Dinner Table PAC, it refrains from doing so owing to the prohibition barring leadership PACs from accepting money from "business entities." Dudley fears imprisonment, and fines and penalties for himself and the church, should he cause the church to make a contribution that violates the leadership PAC restrictions.

44. According to reports available on the Commission's website, the designated caucus committees for 2023 are: House Democratic Campaign Committee, Senate Democratic Campaign Committee, The House Republican Fund, and Maine Senate Republican Majority.

45. The House Republican Fund is registered as controlled by Billy Bob Faulkingham, the minority leader of the House.

46. The Maine Senate Republican Majority is registered as controlled by Trey Steward, the minority leader of the Senate.

47. The two Democratic committees are registered as controlled by non-legislators. Upon information and belief, the Speaker and President direct the expenditures made by the respective PAC. Moreover, each has the authority to designate a different caucus PAC at any time.

48. Both Senate caucus PACs have received donations in 2023 that would either be excessive and/or prohibited if made to a leadership PAC.

49. Neither House caucus PAC has reported significant fundraising in the first quarter of 2023. However, neither is expected to self-limit to the statutory limits imposed upon leadership PACs.

COUNT I
RIGHTS OF FREE SPEECH AND ASSOCIATION
U.S. CONST. AMENDS. I, XIV — 42 U.S.C. § 1983

50. Plaintiffs reallege and incorporate by reference paragraphs 1 through 49 above.

51. The First Amendment protects both political association and political expression. The Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *McCutcheon v. FEC*, 572 U.S. 185, 191–92 (2014) (plurality opinion). Furthermore, "the right of association is a basic constitutional freedom that is closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 206–07 (1982) (internal quotes omitted).

52. Laws that limit the amount of money a person may give to a political action committee intrude upon both of those First Amendment interests and infringe on the rights of contributors, as well as on the rights of advocacy groups and the people who operate them.

53. The Supreme Court has held that government-imposed limits on political contributions must be closely drawn to match a sufficiently important interest. *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (per curiam). Under current caselaw, the only governmental interest that can justify limiting political contributions is an interest in preventing quid pro quo corruption or the appearance thereof.[1]

54. The leadership PAC contribution limits of 21-A MRSA § 1056-C do not advance any sufficiently important governmental interests. And even if they did, they are not closely drawn to match such an interest, considering that they do not apply to PACs affiliated with the most powerful legislators or the most powerful interests.

55. The operative provisions of Title 21-A MRSA § 1056-C, limiting the contributions that leadership PACs may receive from individuals and committees, *id.* §§ 1056-C(1) and (2); and prohibiting leadership PACs from receiving contributions from "business entities," *id.* § 1056-C(3), are not closely drawn to any sufficiently important governmental interest. These provisions violate the First Amendment rights to free speech and association, on their face and as applied to the

---

[1] Plaintiffs do not concede that the restrictions imposed by *Buckley* are unconstitutional or that the current justifications for limiting contributions is valid. While binding upon lower courts, Plaintiffs reserve the right to challenge *Buckley* should this case be granted *certiorari*.

contributions that Plaintiff PACs would accept from individuals, other committees, and "business entities," including the other Plaintiffs.

56. By enforcing 21-A MRSA § 1056-C, Defendants, under color of law, deprive Plaintiffs of the rights free speech and association in violation of the First and Fourteenth Amendments to the United States Constitution. Accordingly, Plaintiffs are damaged in violation of 42 U.S.C. § 1983 and, therefore, they are entitled to declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT II
EQUAL PROTECTION
U.S. CONST. AMEND. XIV — 42 U.S.C. § 1983

57. Plaintiffs reallege and incorporate by reference paragraphs 1-56.

58. The Fourteenth Amendment secures Plaintiffs' right to the equal protection of the law. The right to equal protection is most salient with respect to the exercise of fundamental rights, including the speech and associational rights protected by the First Amendment.

59. So-called "leadership PACs," including The Dinner Table PAC and Fight for Freedom PAC, are similarly situated to traditional and caucus PACs. They all perform the same function. Yet 21-A MRSA § 1056-C treats them unequally with respect to contribution limits, based solely on their associations with legislators who are not caucus leaders.

60. This unequal treatment places leadership PACs at a significant competitive disadvantage relative to caucus and traditional PACs in the ability to express themselves and associate with others. It tilts the political system in favor of entrenched party leadership and other interests, who can continue to raise and spend unlimited funds from unlimited sources in their PACs, and against legislators who may pursue competing political visions, whose PAC functions these limits constrain.

61. The leadership PAC restrictions also violate nearly every legislator's right to equal protection because, unlike nearly all other Mainers—including the most powerful legislators who hold caucus leadership positions—they cannot found, direct, or maintain a PAC free of contribution limits. The leadership PAC restrictions penalize legislators who, ironically, *lack* leadership positions, including Plaintiff Libby, by hobbling their abilities to participate in the political process through PACs.

62. An effect of restricting leadership PACs while not restricting caucus PACs is to entrench power and make individual legislators and legislative candidates more beholden to the Caucus leaders for fundraising and expenditures.

63. For instance, a legislator who falls out of favor with party leadership might face a primary challenger backed by the caucus PAC, with its unlimited fundraising potential. The legislator would be at a significant disadvantage because the legislator would have strict limits on fundraising both for the campaign committee and for the leadership PAC.

64. This structure will also lead to further concentration of power because the unlimited fundraising allowed to caucus PACs will result in the funneling of resources that might have gone to various leadership PACs into a single caucus PAC. Money does not leave politics; it merely migrates.

65. The concentration of money and power with caucus leaders further entrenches leadership because it makes them exceedingly difficult to challenge for party leadership because of the monetary heft they will carry to reward supporters and punish those out of lockstep.

66. As the Ohio and Illinois examples show, the concentration of power makes corruption more likely—not less—because, quite frankly, it is easier to bribe one person than to bribe a majority of a house.

67. None of this is to say that the current caucus chairs are corrupt. It does, however, show how limiting leadership PACs is more likely to result in corruption.

68. The leadership PAC restrictions also violate the equal protection rights of non-officeholders, including Plaintiffs Titcomb, Sutton and Machias Christian Fellowship. Their abilities to associate and speak together with legislators through PACs is severely throttled or eliminated altogether if the legislators with whom they would associate and express themselves lack control over caucus PACs.

69. No legitimate state interest, let alone a compelling or even important one, justifies such discrimination against leadership PACs, the legislators who affiliate with them, and other individuals who would contribute to and otherwise associate with them.

70. Nor is such discrimination a least restrictive, narrowly tailored, direct, proportionate, or rational means of advancing any legitimate state interest.

71. The discrimination is simultaneously over- and underinclusive.

72. It is overinclusive because the restrictions are not necessary and the contribution limits are exceedingly low.

73. It is underinclusive because any legitimate public interest theoretically served by limiting the ability of legislators to control PACs with without fundraising restrictions cannot be valid so long as legislators who are caucus leaders are expressly excluded from those limits.

74. The operative provisions of Title 21-A MRSA § 1056-C, limiting the contributions that leadership PACs may receive from individuals and committees, *id.* §§ 1056-C(1) and (2); and prohibiting leadership PACs from receiving contributions from "business entities," *id.* § 1056-C(3), violate the Fourteenth Amendment right to equal protection, on their face and as-applied to the contributions that Plaintiff PACs would accept from individuals, other committees, and "business entities," including the other Plaintiffs.

75. By enforcing 21-A MRSA § 1056-C, Defendants, under color of law, deprive Plaintiffs of the right to equal protection in violation of the Fourteenth Amendment to the United States Constitution. Accordingly, Plaintiffs are damaged in violation of 42 U.S.C. § 1983, and, therefore, they are entitled to declaratory and preliminary and permanent injunctive relief against continued enforcement and

- 15 -

#16066011v2

70. Nor is such discrimination a least restrictive, narrowly tailored, direct, proportionate, or rational means of advancing any legitimate state interest.

71. The discrimination is simultaneously over- and underinclusive.

72. It is overinclusive because the restrictions are not necessary and the contribution limits are exceedingly low.

73. It is underinclusive because any legitimate public interest theoretically served by limiting the ability of legislators to control PACs with without fundraising restrictions cannot be valid so long as legislators who are caucus leaders are expressly excluded from those limits.

74. The operative provisions of Title 21-A MRSA § 1056-C, limiting the contributions that leadership PACs may receive from individuals and committees, *id.* §§ 1056-C(1) and (2); and prohibiting leadership PACs from receiving contributions from "business entities," *id.* § 1056-C(3), violate the Fourteenth Amendment right to equal protection, on their face and as-applied to the contributions that Plaintiff PACs would accept from individuals, other committees, and "business entities," including the other Plaintiffs.

75. By enforcing 21-A MRSA § 1056-C, Defendants, under color of law, deprive Plaintiffs of the right to equal protection in violation of the Fourteenth Amendment to the United States Constitution. Accordingly, Plaintiffs are damaged in violation of 42 U.S.C. § 1983, and, therefore, they are entitled to declaratory and preliminary and permanent injunctive relief against continued enforcement and

maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Laurel Libby, Alexander Titcomb, Paula Sutton, The Dinner Table PAC, Fight for Freedom PAC, and Machias Christian Fellowship, request that judgment be entered in their favor and against Defendants as follows:

A. An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing 21-A MRSA §1056-C, on its face and as against Plaintiffs;

B. Declaratory relief consistent with the injunction;

C. Costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

D. Any other relief this Court may grant in its discretion.

Respectfully submitted,

/s/ *Joshua Dunlap*
Joshua D. Dunlap
Pierce Atwood LLP
254 Commercial Street
Merrill's Wharf
Portland, ME 04101
207-791-1100
jdunlap@pierceatwood.com
*Counsel of Record for Plaintiffs*

and

Charles Miller*
Adam J. Tragone*
(*pro hac vice to be submitted)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW
Suite 801
Washington, DC 20036
202-301-3300
cmiller@ifs.org
atragone@ifs.org

*Counsel for Plaintiffs*

Dated: May 30, 2023